## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BRIAN TRAINAUSKAS,**<br>**#Y10061,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-cv-00193-SPM** |
| **BARTON FRALICKER,**<br>**NATHAN MCCARTHY,**<br>**KENT BROOKMAN,[1] and**<br>**JACQUELINE LASHBROOK,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

**MCGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 125) filed by Defendants Fralicker, Brookman, McCarthy, and Lashbrook. For the reasons set forth below, the motion is granted in part and denied in part.

### BACKGROUND

Trainauskas, an inmate of the Illinois Department of Corrections ("IDOC") currently housed at Pontiac Correctional Center, commenced this civil action by filing a *pro se* Complaint pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. Trainauskas claims that in 2017, while housed at Menard Correctional Center ("Menard"), he received two unsubstantiated disciplinary tickets for the mailing of letters that discussed matters pertaining to the religious organization, the Guardians of Othala Kindred. Following a disciplinary hearing

---

[1] The Clerk of Court is directed to correct the docket to reflect the proper names of the following Defendants as listed in the Motion for Summary Judgment (Doc. 125): Barton Fralicker ("Barton J. Fralicker"), Nathan McCarthy ("C/O McCarthy"), and Kent Brookman ("Kent E. Brookman").

before the Adjustment Committee, he received excessive sanctions and was held in unconstitutional conditions. The charges were eventually expunged by the Administrative Review Board. After filing an Amended Complaint, Trainauskas is proceeding with the following claims:

**Count 1:**   Fourteenth Amendment claim for deprivation of a liberty interest without due process against Brookman for punishing Trainauskas with segregation following his March 7, 2017 disciplinary hearing.

**Count 2:**   Claim for violating the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (42 U.S.C. § 2000cc-1(a)) against Fralicker, Brookman, McCarthy, and Lashbrook, based on the disciplinary tickets Trainauskas received on February 28, 2017 and March 2, 2017 and associated sanctions.

**Count 3:**   Fourteenth Amendment claim for deprivation of a liberty interest without due process against Fralicker and McCarthy for writing unsubstantiated disciplinary tickets.

**Count 4:**   Eighth Amendment conditions of confinement claim against Lashbrook for the conditions Trainauskas endured while in disciplinary segregation.

(Docs. 28, 29). On June 26, 2020, Defendants filed a Motion for Summary Judgment. Trainauskas filed a Response in Opposition. (Doc. 130).

RELEVANT FACTS

Trainauskas practices the Asatru religion, also known as Odinism. (Doc. 29, p. 2; Doc. 126, p. 3; Doc. 126-1, p. 4).[2] In 2013, he and two other individuals founded the Odinist kindred, the Guardians of Othala Kindred ("the Guardians"), which is a religious community of Odinists formed to promote the Asatru faith. (Doc. 126, p. 3; Doc. 126-1, pp. 4, 9; Doc. 130, pp. 11, 40).

---

[2] In his deposition, Trainauskas describes Odinism and Asatru as separate religions. (Doc. 126-1, p. 4). He stated, "Asatru is actually is own religion. Asatru believes in the worship of numerous Gods. Odinism believes in the same pantheon which comes from the Norse and Celtic pantheon, but we believe Odin to be the highest God." *Id.* Regarding Odinism/Asatru, the IDOC Chaplaincy Handbook provides the following: "Today, most people use the names Asatru and Odinism interchangeably; however, some adherent of Asatru would say that the term Odinism places undue emphasis on only one of the Gods and is therefore too narrow a characterization of the religion." (Doc. 130, p. 132).

Trainauskas is also the author of the book *Odin's Chosen: A Handbook of Ásatrú*, a book of Blótar[3]

containing "extensive, comprehensive, and essential aspects of [Asatru] religious practice." (Doc.

126, p. 3; Doc. 126-1, p. 4; Doc. 130, pp. 11, 45-46). Odinism/Asatru is recognized as a religion

within IDOC. (Doc. 126, p. 3; Doc. 126-3, p. 2; Doc. 130, pp. 11, 132). However, IDOC considers

the Guardians a security threat group ("STG"), and, during the relevant times of this case, *Odin's*

*Chosen* was on the IDOC banned publications list. (Doc. 126, p. 3-4; Doc. 126-4, p. 2). Trainauskas

asserts that he did not know that the Guardians were classified as an STG. (Doc. 130, pp. 12, 27,

53).

On February 28, 2017, Defendant McCarthy, a member of the Internal Affairs Unit at

Menard, intercepted an outgoing letter written by Trainauskas to a man named Dan Moreschi, in

Independence, Missouri. (Doc. 126, p. 4). In his declaration, McCarthy stated that the letter

pertained to charging members of the Guardians an "annual membership fee to cover postage cost

and the time to answer letters." (Doc. 126, p. 4; Doc. 126-5, p. 1; Doc. 130, p. 12). In the letter,

Trainauskas asks Dan Moreschi, if they do charge a membership fee, whether they should charge

"$9, $12, ?/year[?]". (Doc. 126-5, p. 2). According to Trainauskas, Dan Moreschi is another

member of the Guardians, and they were discussing ideas on how to recuperate postage fees

associated with the distribution of an Odinist newsletter. (Doc. 130, p. 12). Because of the letter,

McCarthy wrote a disciplinary ticket charging Trainauskas with the following offenses:

(1) Offense 205 – Security Threat Group of Unauthorized Organizational Activity;
(2) Offense 309 – Petitions, Postings and Business Ventures; and
(3) Offense 310 – Abuse of Privileges.

McCarthy served Trainauskas the ticket that same day, at 7:00 p.m., and Trainauskas refused to

sign the disciplinary ticket when it was served. (Doc. 126, p. 5; Doc. 130, p. 12). Whether

---

[3] Trainauskas states that a book of Blótar "is a holy book which details the proper dates to conduct a Blót, as well as the 'calls' to particular Gods or Goddess[es] in the old Norse language." (Doc. 130, p. 46).

Trainauskas requested for a witness to appear at the disciplinary hearing is disputed. (Doc. 126, p. 5; Doc. 130, p. 12). Trainauskas asserts that prior to the hearing he requested for a witness to be present, Counselor Price, by filing out the witness request section at the bottom of the disciplinary ticket and submitting the request. (Doc. 130, pp. 9, 33, 53).

On March 2, 2017, Defendant Fralicker, a correctional officer in the Intelligence Unit at Robinson Correctional Center ("Robinson"), received an incoming letter that had been flagged by Robinson mailroom staff for investigation. (Doc. 126, p. 5). The letter was addressed to an inmate at Robinson from an individual named Faolchú Ifreann. The returned address listed was: Guardians of Othala, PO BOX 216, Downers Grove, IL 60515. Fralicker searched an IDOC database and discovered that "Faolchú Ifreann" is a documented alias of Trainauskas. (*Id.*). According to Fralicker, upon further investigation, he discovered that Trainauskas had previously admitted to running the Guardians through his common law wife using the Downers Grove address. (Doc. 126-4, p. 1-2). Trainauskas denies admitting to running the Guardians through his wife. (Doc. 130, p. 53). He also denies writing the letter to the inmate at Robinson or using the Guardians to contact or recruit other prisoners. (*Id.* at pp. 12-13, 51-52).

Fralicker wrote Trainauskas a disciplinary ticket charging Trainauskas with the same disciplinary offenses as the previous ticket written by McCarthy. Trainauskas was served with the ticket that night, March 2, 2017, at 6:28 p.m. (Doc. 126, p. 5). He again refused to sign the disciplinary ticket. (Doc. 126, p. 5; Doc. 130, p. 12). Trainauskas did not request any witnesses to appear at the disciplinary hearing by filing out the space at the bottom of the disciplinary ticket. (*Id.*).

Both tickets were heard at the same time before the Adjustment Committee ("Committee") at Menard on March 7, 2017. (Doc. 126, p. 6; Doc. 126-1, p. 4; Doc. 130, p. 13). Defendant Brookman was the Chairperson of the Committee and was present during the hearing. Trainauskas

was given 24-hour notice of the ticket. (Doc. 126-1, p. 5). He provided a written statement to the Committee and attended the hearing. (*Id.*). Trainauskas claims that at the hearing he again requested for his witness, Counselor Price, to be interviewed, which was denied. (Doc. 130, p. 23). Trainauskas also claims that Brookman stated that IDOC does not recognize Odinism as a religion[4] and that he, Brookman, would need to consult with Chaplain Keim. (Doc. 126-1, p. 8; Doc. 130, pp. 23, 53).

According to Brookman, Trainauskas did not ask for any witness testimony, as indicated on the Final Summary Report. (Doc. 126-8, p. 1; Doc. 126-9, p. 3). He also claims that he discussed the Guardians with Trainauskas at the hearing and told Trainauskas that he would speak to Chaplain Keim. (Doc. 126-9, p. 2). Brookman recounts that Chaplain Keim informed him that, "although Asatru is a recognized religion within IDOC, the Guardians of Othala is not." (*Id.*).

Based upon the evidence contained in the disciplinary tickets, the Committee found Trainauskas guilty of all offenses and recommended that he be disciplined with 1 year C grade status, 1 year segregation, 1 year commissary restriction, and 6 months of no-contact visits. (Doc. 126, p. 6). Defendant Warden Lashbrook concurred with the findings of the Committee and approved the recommended disciplinary sanctions. (Doc. 126, p. 6; Doc. 126-1, p. 6; Doc. 126-8). Trainauskas was placed in disciplinary segregation on March 13, 2017. (Doc. 126, p. 7; Doc. 130, p. 13).

Trainauskas was held in North 2, disciplinary segregation, from March 13, 2017, until July 11, 2017. (Doc. 126-1, p. 8; Doc. 126-2).[5] During a majority of this time, Trainauskas was housed

---

[4] A couple of times in the Response, Trainauskas recounts that Brookman stated definitely that IDOC does not recognize Odinism as a religion, but he also states that Brookman said more generally that he "did not recognize Odinism and that he would have to contact Chaplain Keim on his stance." (Doc. 130, pp. 9, 23, 53).

[5] Defendants state in the Motion for Summary Judgment that Trainauskas was held in disciplinary segregation until July 17, 2017. (Doc. 126, p. 7). Trainauskas testified, however, that he was released from disciplinary segregation on July 11, 2017, and that he was placed in "East or West House" after segregation. (Doc. 126-1, p. 8). His testimony is supported by the housing log, which indicates he was moved from North 2 Cell House to East Cell House on July 11,

in a double occupancy cell that is smaller than the cells in general population.[6] (Doc. 29, p. 4). His cell had a bunkbed, toilet, sink, and desk. He had a fabric mattress, which was stained with blood, urine, feces, mace, and bodily fluids and was provided sheets and a blanket. (Doc. 130, p. 10; Doc. 126-1, p. 26). The amount of time he was afforded to leave his cell each week is disputed. (*Id.* at p. 5; Doc. 126-1, p. 19). Trainauskas was served all three meals in his cell and denied access to the law library, chapel, and contact visits. When the facility was not on lockdown, Trainauskas was allowed to leave his cell up to twice a week to shower and twice a week for recreation periods. (Doc. 126-1, p. 20). He also attended weekly mental health groups, one-on-one mental health treatments, and medical visits. (Doc. 126, p. 9; Doc. 126-1, pp. 20, 23-24).

The temperature of the cells were Trainauskas was housed and the measures taken by staff to mitigate the heat are also disputed. (Doc. 126, p. 8-9; Doc. 130, p. 13-14). Menard does not have air conditioning and "can get extremely warm in the summer months." (Doc. 126, p. 7). Additionally, Trainauskas's cell had a solid steel door, rather than open bars, making his cell even warmer. (Doc. 126, p. 13; Doc. 126-1, p. 19; Doc. 130, p. 14). During warm months, Warden Lashbrook stated that temperature logs were maintained throughout Menard, and the temperatures were recorded multiple times each day. (Doc. 126, p. 8; Doc. 126-13, p. 3). According to Lashbrook, when the heat index reached above 90 degrees, certain precautions were taken to mitigate the heat such as passing out ice, allowing more frequent showers, and allowing offenders to buy personal fans or request a personal fan on loan. (*Id.*). While Trainauskas was in North 2, he and his cellmate both had individual fans in the cell. (Doc. 130, p. 13).

According to Defendants and not disputed by Trainauskas, due to a clerical error by the acting secretary of the Committee, the Adjustment Committee Final Summary Report only listed

---

2017. (Doc. 126-2).
[6] From March 13, 2017 until July 11, 2017, Trainauskas was housed in three different cells. (*See* Doc. 126-2).

the ticket issued by Fralicker at the top of the page, rather than both tickets. (Doc. 126, p. 6-7; Doc. 130, p. 13). Under the "Basis of Decision" section of the Final Summary Report, the description provided is from the ticket issued by McCarthy, and this section does not contain a description of the ticket written by Fralicker. (Doc. 126, p. 6; Doc. 126-8, p. 1). On appeal, because of this clerical error, the Administrative Review Board determined that the basis for the Committee's decision did not substantiate the ticket written by Fralicker. (Doc. 126, p. 7). The Administrative Review Board recommended the disciplinary report be expunged. Trainauskas was released from disciplinary segregation on July 11, 2017. (Doc. 126-1, p. 8; Doc. 126-2).

## SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Donahoe*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

**ANALYSIS**

### *I. Counts 1 and 3 Due Process*

"The Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property." *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017). When an inmate raises a procedural due process claim based on disciplinary proceedings, the Court undertakes a two-part analysis. *Id.* The Court first evaluates whether the prisoner was deprived of a protected liberty interest, and then second, evaluates whether the process he was afforded was constitutionally deficient. *Id.* (citing *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016)); *accord Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019) (citing *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007)).

Generally, prisoners "do not have a liberty interest in avoiding brief periods of segregation, whether administrative or disciplinary." *Smith v. Akpore,* 689 F. App'x 458, 460 (7th Cir. 2017). *See also Hardaway v. Meyerhoff,* 734 F.3d 740, 743 (7th Cir. 2013) ("an inmate's liberty interest in avoiding disciplinary segregation is limited") (citing *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)). A protected liberty interest is triggered only when the segregation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Lisle*, 933 F.3d at 721 (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). *See also Miller v. Dobier*, 634 F.3d 412, 414–15 (7th Cir. 2011) ("Disciplinary measures that do not substantially worsen the conditions of confinement of a lawfully confined person are not actionable under the due process clause."). In order to determine if a sentence of segregation amounts to an atypical and significant hardship, the Court looks "to both the duration of the segregation and the conditions endured." *Lisle*, 933 F.3d at 721 (citing *Marion*, 559 F.3d at 697). The Court "'must take into consideration all of the circumstances of a prisoner's confinement in order to ascertain whether' he has been deprived of liberty within the meaning of the due process clause." *Kervin v.*

Page 8 of 23

*Barnes,* 787 F. 3d 833, 836 (7th Cir. 2015) (quoting *Marion,* 559 F. 3d at 699).

As to the duration, four months of segregation, "is not such an extreme term and, standing alone, would not trigger due process rights." *Marion,* 559 F. 3d at 698 (noting that six months in segregation, without additional facts, did not trigger due process rights). *See also Beamon v. Pollard,* 711 F. App'x 794, 765 (7th Cir. 2018) (holding that "135 days in segregation—absent any atypical conditions related to confinement—does not violate the Fourteenth Amendment"). Thus, the Court must address the facts alleged regarding conditions of confinement.

Defendants argue that the conditions complained of by Trainauskas, mainly the heat and limited cell movement, are not unique to inmates held in segregation. (Doc. 126, p. 11-15). Trainauskas contends that his living conditions in disciplinary segregation were unconstitutional and extreme compared to general population and resulted in the deterioration of his physical and mental health. (Doc. 130, p. 58-60). The key comparison when considering whether the conditions are significantly harsher than those in the normal prison environment, however, "is between disciplinary segregation and nondisciplinary segregation rather than between disciplinary segregation and the general prison population." *Lekas v. Briley,* 405 F. 3d 602, 609 (7th Cir. 2005) (quoting *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997)). That is because "in every state's prison system, any member of the general prison population is subject, without remedy, to assignment to administrative segregation or protective custody at the sole discretion of prison officials. . . if for no other reason than to alleviate over-crowding concerns within the prison," and therefore, discretionary segregation is essentially an "ordinary incident of prison life." *Id.*

Here, the deprivations Trainauskas alleges to have endured while in disciplinary segregation are not so extreme as to implicate due process considerations. First, the loss of certain

privileges, such as commissary, television, visitation, and library access[7] does not rise to the level

of a liberty interest that requires constitutional protections. *See Thomas v. Ramos,* 130 F. 3d 754,

762 n. 8 (7th Cir. 1997) (there is no protected liberty interest implicated in demotion to C-grade

status and loss of commissary privileges); *Woody v. Zatecky,* 594 F. App'x 311, 312 (7th Cir.

2015) ("courts have held that a loss of visitation privileges—including contact visits—is not an

atypical and significant hardship.") (citations omitted); *Lekas,* 405 F. 3d at 610-11. Second,

Trainauskas has not presented any evidence supporting his contention that the conditions of

confinement he experienced are unique to disciplinary segregation. *See Marion v. Radtke,* 641 F.

3d 874, 876-77 (7th Cir. 2011) ("once the custodian contends that the difference between one cell

and another does not affect liberty, the prisoner must reply with evidence").

On March 2, 2017, Trainauskas was moved to administrative segregation in North 2 Cell

House, gallery 4, and he was placed in disciplinary segregation on March 13, 2017. (Doc. 126, p.

6-7; Doc. 126-1, p. 7; Doc. 126-25; Doc. 130, p. 13). During his time in disciplinary segregation

he remained in North 2 Cell House and was held in cells located in both 4 gallery and 6 gallery.

(Doc. 126-1, p. 21; Doc. 126-2). Trainauskas alleges that while in disciplinary segregation he was

(1) double celled with another inmate in an exceptionally small cell with a steel door; (2) exposed

to excessive heat; and (3) usually kept in his cell for twenty-four hours at a time. (Doc. 126-1, p.

19; Doc. 130, p. 19).

Based on the record, however, the cells used to house Trainauskas in disciplinary

segregation do not significantly differ from the administrative segregation cells, where he was

housed prior to his disciplinary hearing. In fact, Trainauskas states that he was subjected to

---

[7] The Court notes that Trainauskas has not alleged a denial of access to courts claim due to his lack of access to the law library. (Doc. 29, p. 5). *See Smith v. Shawnee Library Sys.,* 60 F. 3d 317, 323 (7th Cir. 1995) (stating that prisoners are entitled to "meaningful" access to the courts, not "unfettered direct access to law libraries"). Furthermore, during his deposition, he testified that when the facility is not on lockdown, the law library sends someone to the segregation unit to pick up requests on a weekly basis. (Doc. 126-1, p. 22).

disciplinary segregation conditions prior to his hearing, confirming that the conditions are the same, and according to the record, the size of the cells in North 2 are all the same, 4'6" wide by 10'6" long by 8'2" high. (Doc. 130, pp. 19, 22, 72). Trainauskas testified that the segregation cells at Menard "are tiny and they're double celled," and 4 and 6 galleries both have a mixture of cells with solid steel doors and cells with open bars as doors. (Doc. 126-1, pp. 17, 21). While in general population inmates had a plastic mattress and were given pillows, Trainauskas testified that all the cells in segregation had fabric mattresses, many which were stained, and no pillows were provided. (*Id.* at p. 26). His testimony did not distinguish between administrative and disciplinary segregation cells.

As for the temperature of the cells, during the summer months of 2017, every inmate at Menard experienced excessive heat, regardless of cell assignment. Menard does not have air conditioning, and the facility, which is over one hundred year old, becomes extremely warm in the summer months. (Doc. 126, p. 13; Doc. 126-1, p. 17). Trainauskas testified that "for some reason in Menard it's just unseasonably hot. It's just really, really hot in Menard." (Doc. 126-1, pp. 17, 19). Based on the temperature logs submitted by Defendants, North 2 was not always the hottest cell house at Menard during the time period that Trainauskas was housed in segregation, demonstrating that high temperatures were not unique to inmates kept in disciplinary segregation. (Doc. 126-15). Additionally, he and his cellmate both had individual fans, and he testified that he never had concerns regarding having enough water to drink. (Doc. 126-1, p. 26).

Regarding limited cell movement, Trainauskas left his cell twice a week for yard, once to twice a week for showers, and once a week for mental health group, which lasted between one to two hours. (Doc. 126-1, pp. 20, 24). He also left his cell on four to six occasions for appointments with a mental health professional and would leave for appointments with a medical doctor. (*Id.* at p. 24-25). When the facility was on a Level 1, 2, 3, or 4 lockdown, Trainauskas was confined to

his cell for twenty-four hours at a time, except for weekly showers. (*Id.* at pp. 19, 22). During his time in disciplinary segregation, Menard went on lockdown "approximately about a dozen times" and "it was not uncommon for Menard to go on lockdown for two weeks to a month" at a time. (*Id.* at p. 20).Trainauskas testified that when Menard was on Level 1 lockdown, all inmates were prohibited from leaving their cells, but he did not provide any information regarding out-of-cell movement for inmates housed in administrative segregation during Level 2, 3, or 4 lockdowns. (*Id.* at p. 21).

Given that the conditions of disciplinary segregation appear to be "virtually indistinguishable from conditions of discretionary segregation," and the Seventh Circuit history on atypical and unusually harsh conditions,[8] the Court finds that Trainauskas was not denied his liberty when he was placed in disciplinary segregation. *Lekas,* 405 F. 3d at 613. *See also Radtke,* 641 F. 3d at 877 ("[w]hen a plaintiff fails to produce evidence, the defendant is entitled to judgment"). And since due process was not required prior to moving Trainauskas from general population to disciplinary segregation, he could not have suffered a constitutional deprivation when he was issued unsubstantiated disciplinary tickets, prohibited from calling a witness at his disciplinary hearing, and subsequently sanctioned. Therefore, summary judgment shall be granted to Defendants as to Counts 1 and 3.

## II. Count 2 Free Exercise/RLUIPA

Regarding Trainauskas's religious claims, the Court first must address new allegations

---

[8] *See Singh v. Gegare,* 651 F. App'x 551, 555 (7th Cir. 2016) (no liberty interest where inmate was in segregation for 105 days with access to the showers three times a week, recreation for three hours a week, and permitted to leave cell for medical appointments, visits, and legal matters); *Hardaway,* 734 F. 3d at 744 (no liberty interest where inmate was in segregation for six months and one day with a confrontational cellmate, faced psychological problems, and had only weekly access to the shower and prison yard); *Thomas v. Ramos,* 130 F.3d at 754 (7th Cir. 1997) (finding no liberty interest where inmate spent 70 days confined 24–hours per day in small cell with another inmate, no access to prison work or educational programs, no access to the prison yard, day room, or gym, and no ability to leave cell except for doctor visits and to see the segregation superintendent). *See also Pearson v. Ramos,* 237 F.3d 881, 884 (7th Cir. 2001) (a denial of a prisoner's yard privileges for not more than 90 days at a stretch is generally not cruel and unusual punishment).

regarding the denial of access to religious items and services *while* in segregation. In the Response in Opposition to Defendant's Motion for Summary Judgment, Trainauskas claims that while in segregation he was prohibited from practicing his faith in any meaningful way. (Doc. 130, p. 13). He was denied access to religious services and possession of religious items, such as Thor's Hammer Pendant, a rune set, books on runes, *Odin's Chosen* or any other book of Blótar, and the magazine *Vor Trú*. (Doc. 130, pp. 24, 26, 28, 31, 47, 58). Other than his allegations regarding the confiscation of the *Vor Trú* magazine, which has been dismissed,[9] and denial of access to chapel, which was asserted in support of his conditions of confinement claim,[10] these factual assertions were not included in the Amended Complaint. Trainauskas's First Amendment and RLUIPA claim (Count 2) is proceeding against Fralicker, Brookman, McCarthy, and Lashbrook for "punishing him for practicing Odinism" by writing him disciplinary tickets and implementing severe sanctions. (Doc. 29, p. 13; *see also* Doc. 126-1, pp. 3, 4, 18; Doc. 130, p. 33). Although the Court is to construe the complaints of *pro se* plaintiffs liberally, there is no indication in the Amended Complaint that Trainauskas intended to assert his First Amendment/RLUIPA claim against Defendants for actions conducted while he was held in disciplinary segregation. It is too late to add new claims, and Trainauskas cannot amend his theory of Count 2 by way of his summary judgment brief. *See Anderson v. Donahoe*, 699 F.3d at 997 ("a plaintiff may not amend his

---

[9] In original Complaint, Trainauskas asserted that on March 30, 2017, mailroom staff confiscated the magazine *Vor Trú,* an Asatru publication, in violation of the First Amendment. (Doc. 1). The Court dismissed the claim, designated as Count 6, without prejudice because it was not associated with any named defendants. (Doc. 5, p. 16). Trainauskas then filed a Motion to Leave to File Amended Complaint reasserting that the magazine was unlawfully confiscated by mailroom staff and that it was his belief that McCarthy classified the magazine as STG material. (Doc. 29, p. 8). After review of the proposed amended complaint, Magistrate Judge Wilkerson recommended that the Motion to Leave to File Amended Complaint be denied because none of the new claims in the proposed amended complaint survived threshold review. (Doc. 22). Trainauskas filed an objection to Jude Wilkerson's report and recommendations. (Doc. 25). Based on his objections, Chief Judge Rosenstengel adopted in part the report and reinstated Counts 3 and 4. (Doc. 28). Trainauskas did not object to Judge Wilkerson's report concerning his claims regarding the denial of the magazine, and Count 6 was not reinstated. Therefore, Count 6 remains dismissed without prejudice and is not before the Court.

[10] *See* Doc. 29, p. 5 and Doc. 130, p. 20.

complaint through arguments in his brief in opposition to a motion for summary judgment"). Thus, the Court will consider the factual allegations regarding denial of religious items and services while in segregation to "the extent that they are consistent with, or add to, the deprivations concomitant with the claims described above" and will not consider them to the extent they raise new First Amendment or RLUIPA claims. *Smith v. Dart,* 803 F. 3d 304, 311 (7th Cir. 2015).

However, for the sake of completeness, assuming Trainauskas's assertions that he was denied religious items and access to religious services are properly before the Court, they do not survive summary judgment. Section 1983 requires a plaintiff to establish that each defendant "'was personally responsible for the deprivation of a constitutional right.' To be personally responsible, an official 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Knight v. Wiseman*, 590 F.3d 458, 462–63 (7th Cir. 2009) (citation omitted) (quoting *Johnson v. Snyde*r, 444 F.3d 579, 583 (7th Cir. 2006)). He claims that "Defendants created a substantial burden on Plaintiff's religious right when they denied him every item essential to practice his religion." (Doc. 130, p. 24). He also asserts it is was IDOC's "intelligence unit, of which Defendants McCarthy and Fralicker are part of, who banned 'Odin's Chosen: A Handbook of Ásatrú,' the religious magazine 'Vor Trú,' our kindred hammer pendant, and virtually every book of Blótar and Countless other Odinist Books." (*Id.* at p. 47). Other than conclusory statements, Trainauskas has not provided any evidence from which a jury to conclude that Defendants Brookman, Lashbrook, McCarthy, and Fralicker were personally responsible for or had any involvement in the denial of religions items and access to religious services while he was in disciplinary segregation. Therefore, these claims do not survive summary judgment.

### a.   *Free Exercise Clause*

The First Amendment's Free Exercise Clause "prohibits the state from imposing a substantial burden on a central religious belief or practice." *Kaufman v. Pugh*, 733 F.3d 692, 696

(7th Cir. 2013). "The Supreme Court has explained that a substantial burden is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Neely-Bey Tarik-El v. Conley,* 912 F. 3d 989, 1003 (7th Cir. 2019) (quoting *Thomas v. Review Bd.,* 450 U.S. 707, 718) (1981)).

Trainauskas argues that Defendants have "engaged in a campaign of religious persecution against Odinists." (Doc. 126-1, p. 8; Doc. 130, p. 24). He was issued disciplinary tickets and sanctioned for practicing his religion, depriving him of spiritual connection to his kindred. (Doc. 29, p. 13; Doc. 130, pp. 8, 26-27, 33). He states that Odinists strive for spiritual development and do so by teaching others about the ways, customs, and religious practice of their ancestors. (Doc. 130, p. 26). Citing to the IDOC Chaplaincy Handbook, Trainauskas asserts that a kindred is a tenet of his faith, which provides for spiritual expression and spiritual development. (*Id.* at pp. 26, 43, 130, 132). He points out that Defendants have not provided any basis for classifying his kindred, the Guardians, as an STG, and Brookman at his hearing stated Odinism was not an IDOC recognized religion. He argues that none of the members the Guardians have engaged in any of the illegal activities listed by Defendants. (*Id.* at p. 27).

Although Defendants have not provided any explanation for why the Guardians have been identified as an STG, the Court agrees that Defendants did not impose a substantial burden on Trainauskas's ability to exercise his religion by disciplining him for writing letters regarding the Guardians. At his deposition, Trainauskas testified that the Guardians is not a religion but a religious organization, founded by him and two other detainees in 2013. (Doc. 126-1, p. 9; Doc. 130, pp. 40, 49, 53). He states that because of his incarceration, Moreschi, the recipient of the first letter, took a leadership role in the organization and "is in charge of virtually all kindred matters." (Doc. 130, p. 49; Doc. 126-1, p. 16). Part of Moreschi's leadership duties were to correspond with other Odinists or those requesting information pertaining to the practice of Odinism. (Doc. 126-1,

Page 15 of 23

p. 16). Moreschi wrote to Trainauskas at Menard regarding financial concerns with answering the volume of letters he had been receiving regarding Odinism and the Guardians. (Doc. 130, p. 50). Trainauskas responded to Moreschi's letter "to assist him in covering postage fees." (Doc. 126-1, pp. 16, 18; Doc. 130, p. 50). While a tenet of Trainauskas's faith may be communion with other individuals who practice Odinism and participation in a kindred, he has not provided evidence to support the conclusion that the purpose of the letter was spiritual development or religious fellowship or that he was punished for practicing Odinism. (*See* Doc. 126-1, p. 16). Rather, the purpose of the letter was administrative in nature.

Furthermore, Trainauskas repeatedly denies sending the second letter retrieved by Fralicker at Robinson. (Doc. 126-1, pp. 7, 16-17; Doc. 130, pp. 27, 51-52; Doc. 29, pp. 3, 11). He states that he has never used the Guardians "as a vehicle to contact prisoners in IDOC." (Doc. 130, p. 52). If, as he claims, he did not engage in this alleged conduct in the first place, then the prohibition of such conduct could not have interfered with Trainauskas's ability to continue participating in central practices of his faith.

Although there seemed to be some confusion by Brookhart at the hearing about the differences between Odinism and the Guardians, Trainauskas was ultimately prohibited from and disciplined for conducting organizational tasks associated with the Guardians. He has not presented evidence for a jury to conclude that the disciplinary tickets written by McCarthy and Fralicker and resulting sanctions determined by Brookman and Lashbrook imposed a burden on his religious exercise or denied him a meaningful way to practice Odinism. Thus, summary judgment will be granted as to the First Amendment claim of Count 2.

### b. *RLUIPA*

RLUIPA prohibits prison officials from "impos[ing] a substantial burden on the religious exercise" of an inmate "unless the government demonstrates that imposition of the burden on that

person ... is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a). *See also Grayson v. Schule*r, 666 F.3d 450, 451 (7th Cir. 2012).

Only prospective injunctive relief is available under RLUIPA. A plaintiff may obtain an injunction or a declaration but not money damages. *Grayson*, 666 F.3d at 451. To obtain prospective relief, there must be a risk that the defendant will violate the plaintiff's rights again. *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019). When a prisoner's claim relates to events at a particular prison, the general rule is that any request for prospective relief becomes moot if a prisoner is transferred because it is unlikely that the prisoner will be subjected to the same conditions again. *Thompson v. Bukowski*, No. 18-3009, 812 Fed. App'x. 360, 2020 WL 2097278, at *2 (7th Cir. May 1, 2020); *Maddox v. Love*, 655 F.3d 709, 716–17 (7th Cir. 2011); *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009). Injunctive claims will not be found moot, however, if the plaintiff can demonstrate a likelihood of being retransferred back to the former institution. *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). Mere speculation of a retransfer, however, is not sufficient to prevent a claim for injunctive relief from becoming moot. *Id.* An inmate must make a showing that it is a "realistic possibility" that he will be retransferred to the prior institution. *See Maddox*, 655 F.3d at 716.

Here, Defendants contend that Trainauskas's RLUIPA claim is moot, as he was transferred from Menard on November 1, 2017, and has been housed at Pontiac Correctional Center ("Pontiac") since June 21, 2018. (Doc. 126-, p. 22). Trainauskas argues that the claim is not moot because he was scheduled to be transferred back to Menard in August 2019 but the transfer was cancelled due to a court date in Will County. (Doc. 130, p. 29).

On June 27, 2018, Trainauskas notified the Court that he had been transferred to Pontiac. (Doc. 24). Other than this single notification of address change, there is nothing in the record to indicate that he was ever transferred back to Menard, and he has not provided evidence suggesting

that he will be returning there. As Trainauskas has not demonstrated a "realistic possibility" or "reasonable expectation" that he will again be housed in Menard, his claim for injunctive relief pursuant to RLUIPA is moot.

### III. Count 4 Conditions of Confinement

Prison officials violate the Eighth Amendment when "they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To succeed on a claim of deliberate indifference to a condition of confinement, a prisoner must show: (1) a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities or the denial of basic human needs; and (2) prison officials were deliberately indifferent to this state of affairs. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quotation marks and citation omitted); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). To be found liable "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Defendant Warden Lashbrook argues that Trainauskas's conditions of confinement did not violate the Constitution. (Doc. 126, p. 26). She does not address the size of the cell or the lack of ventilation; rather, she states that Trainauskas has failed to provide evidence that the heat at Menard was sufficiently extreme, or that the heat lasted for an extended period of time. While Trainauskas may have been uncomfortable, Lashbrook states that the Eighth Amendment does not require comfortable prisons. (*Id.*) (citing *Farmer,* 511 U.S. at 832). The temperature logs of North 2 Cell House reveal that the temperature did not reach above 100 degrees, as alleged, and remedial measures were taken by staff. (*See* Doc. 126-14). Both Trainauskas and his cellmate had fans,

there were fans in the galleries, and offenders were passed ice twice a day and allowed to shower more frequently.

Lashbrook further asserts that even if the conditions of Trainauskas's confinement violated the Constitution, she was not deliberately indifferent. (Doc. 126, p. 27). Trainauskas has not provided any evidence that Lashbrook was aware of any specific risk to him. He did not submit any grievances regarding the conditions of his cell in North 2, nor did he send any communication to Lashbrook. Furthermore, she enacted specific protocols in order to alleviate the threat of harm. (Doc. 126-13, p. 2-3). Because Trainauskas has failed to put forth evidence demonstrating that Lashbrook purposefully ignored the conditions of his cell, she states that summary judgment is warranted.

Although the conditions Trainauskas experienced in disciplinary segregation "have no bearing" on whether Defendants were required to provide him with procedural protections before placing him there, Trainauskas may still seek redress under the Eighth Amendment. *Townsend v. Fuchs,* 522 F. 3d 765, 772 (7th Cir. 2008) (affirming the district court's finding of no liberty interest in avoiding placement in discretionary segregation and stating that the issue of cell conditions "is best analyzed as a claim brought under the Eighth Amendment"). *See also Obriecht v. Raemisch,* 565 F. App'x 535, 540 (7th Cir. 2014) (finding that 78 days in "deplorable conditions" did not implicate a liberty interest, but that plaintiff might have challenged the conditions of confinement while in segregation). And viewing the record in a light most favorable to Trainauskas, the Court finds that he has established a triable issue of fact regarding his conditions of confinement while in segregation.

"It is well established that individuals can be harmed by placement in cells that are unconstitutionally small, even if they have occasional opportunities to leave their cells and have not sought medical treatment from problems related to cell size." *Randle v. Baldwin,* No. 16-CV-

1191-NJR, 2020 WL 1550638, at *15 (S.D. Ill. Apr. 1, 2020) (citing *Rhodes v. Chapman,* 452 U.S. 337 (1981); *Smith v. Fairman*, 690 F.2d 122 (7th Cir. 1982)). Additionally, "exposing inmates to extreme temperatures coupled with the inability to mitigate the condition, can violate the Eight Amendment." *Jose-Nicolas v. Butler,* No. 15-cv-01317-NJR-DGW, 2018 WL 7020205 at *3 (S.D. Ill. Dec. 19, 2018) (citations omitted). When addressing similar claims regarding conditions of confinement and double celling of inmates in the cells of North 1 and North 2 Cell Houses at Menard, the courts in this district have repeatedly held that "there is a clear argument that conditions were not constitutional." *See Randle,* 2020 WL 1550638; *Maya v. Wexford Health Sources, Inc.,* No. 17-cv-00546-NJR, 2020 WL 5517465 at *15-16 (S.D. Ill. Sept. 14, 2020); *Turley v. Lashbrook,* No. 08-07-SCW, 2018 WL 785236 at * 5 (S.D. Ill. Sept. 26, 2018). *See also Lightfoot v. Walker,* 486 F. Supp. 504, 510 (S.D. Ill. 1980) (finding that double celling of inmates in the East and South Cell Houses at Menard, where inmates only had 65 and 56 square feet, inadequate).

Here, Trainauskas was double celled in a cell that was approximately 48 square feet. (Doc. 130, p. 72). The space was even more limited when factoring in the bunkbed, sink and toilet, and desk. (Doc. 126-1, p. 19; Doc. 130, p. 19). These "conditions were exacerbated by high temperatures" and poor ventilation. *Maya,* 2020 WL 5517465 at *16. Although Lashbrook contends that mitigating measures were taken when the heat index was 90 degrees or over, Trainauskas argues that, other than having a personal fan, these measures were not implemented. (Doc. 130, p. 13). Specifically, the chuckhole was only opened once during his time in segregation. (Doc. 126-1, p. 17; Doc. 130, p. 21). Trainauskas also states that the temperature logs only record the temperature in the galleries and are not adequate representations of the temperature inside his cell, which was hotter due to the solid steel door and no ventilation. (Doc. 130, p. 14). He testified that the temperature in his cell could reach up to 130 degrees, (Doc. 126-1, p. 17; Doc. 130, p. 21),

which "is sufficient to create a genuine dispute of fact." *Jose-Nicolas v. Buter*, No. 15-cv-01317-NJR-DGW, 2018 WL 7020205, at *4 (S.D. Ill. Dec. 19, 2018) (citing J*ordan v. Milwaukee Cty*., 680 F. App'x 479, 483 (7th Cir. 2017)). Thus, a jury could reasonably find that the combination of being double celled in a small cell along with excessive heat and lack of ventilation denied Trainauskas the basic necessities of civilized life. *See Isby*, 856 F. 3d at 522.

As to whether Lashbrook acted with deliberate indifference, Trainauskas does not assert that he directly communicated with Lashbrook regarding his cell conditions. He states that her knowledge of the risks imposed by double celling inmates in North 2 can be inferred from the heat protocols that were implemented, the many grievances that were sent by other inmates in segregation during March, June, and July of 2017, the obvious nature of the conditions, and previous court decisions regarding double celling at Menard. (Doc. 130, pp. 35-37, 56). The Court agrees.

While Lashbrook may not have been directly on notice of Trainauskas's placement in disciplinary segregation in North 2 Cell House, Lashbrook, as the warden of the prison, "can realistically be expected to know about or participate in creating systemic [prison] conditions" such as the policies surrounding celling inmates and the heating and cooling of the cells. *Sanders v. Sheahan,* 198 F. 3d 626, 629 (7th Cir. 1999).[11] *See also Antonelli v. Sheahan,* 81 F. 3d 1422, 1428-1429 (7th Cir. 1996). Because of the "long history of double-celling at Menard, the numerous lawsuits that have resulted from the practice and the periodic rebukes given to IDOC by this Court" there is little room for doubt that Warden Lashbrook "was aware of the individualized consequences of [her] broader logistical and budgetary decisionmaking and ultimately had direct

---

[11] The Seventh Circuit in *Sanders* held that claims regarding nutritionally deficient food and inadequate hygiene "are conceivably systemic conditions that can support a valid claim against [the sheriff and the director] in their personal capacity," while complaints regarding issues confined to a particular dormitory do not support such a claim. *Sanders,* 198 F. at 628.

personal involvement in double-celling inmates such as [Trainauskas]." *Randle,* 2020 WL 1550638, at *5. Furthermore, it is not disputed that she was aware that heat was a concern for both staff and inmates at Menard. (*See* Doc. 126-13, p. 3). She argues that she took affirmative steps to mitigate the effects of the heat, but a "jury should determine whether the steps taken by individuals in [Lashbrook's] position[] were, in fact, reasonable. *Silva v. Pfister,* 2021 WL 1103483 at *7 (N.D. Ill. Mar. 23, 2021) (citations omitted). Because Lashbrook "may be found to have been put on notice by other proceedings that have alleged similar constitutional violations, she is not entitled to summary judgment." *Maya,* 2020 WL 5517465 at *16 (citations omitted).

## *IV. Qualified Immunity*

Defendants claim that they are entitled to qualified immunity on all counts. To determine whether an official is entitled to qualified immunity, the Court must assess (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Here, the Court has granted summary judgment on all counts except Count 4 against Lashbrook for unconstitutional cell size, excessive heat, and poor ventilation. If, as Trainauskas alleges, he was double-celled in a cell that was so small as to violate the minimum standards of decency, it would amount to a constitutional violation. This violation would be clearly established, for the Supreme Court and courts within this circuit have repeatedly addressed how excessively small cells and overcrowding can violate the Eighth Amendment, even discussing this in relation to Menard specifically. Whether Lashbrook was actually aware of the alleged conditions of the cell is a factual dispute to be resolved by the jury. Thus, Lashbrook is not entitled to qualified immunity.

### DISPOSITION

For the reasons provided, the Court **GRANTS in part** and **DENIES in part** the motion

for Summary Judgment (Doc. 125) filed by Defendants Fralicker, Brookman, McCarthy, and Lashbrook. The Motion is granted as to **Counts 1, 2,** and **3** but is denied as to **Count 4** against Lashbrook. Accordingly, the claims against Brookman, Fralicker, and McCarthy are **DISMISSED with prejudice**. The Clerk shall terminate them as defendants and enter judgment in their favor at the conclusion of the entire action. The Clerk is directed to correct the docket in accordance with footnote one. This action will proceed on Count 4 against Defendant Lashbrook.

A status conference will be set at a later date to set firm dates for a final pretrial conference and jury trial. In the meantime, the parties are encouraged to discuss whether a settlement conference would be beneficial and, if so, request a referral to a magistrate judge for that purpose.

**IT IS SO ORDERED.**

**DATED:   March 29, 2021**

 *s/Stephen P. McGlynn*_____
**STEPHEN P. MCGLYNN**
**United States District Judge**